247 F.2d 538
 POWER AUTHORITY of The State OF NEW YORK, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Oneida Madison Electric Cooperative, et al. (Rural Electric Distribution Cooperatives), People of the State of New York, Rochester Gas and Electric Corporation, American Public Power Association, and the City of Jamestown, New York, Intervenors.
 No. 13652.
 United States Court of Appeals District of Columbia Circuit.
 Argued April 4, 1957.
 Decided June 20, 1957.
 
 Mr. Philip C. Jessup, New York City, with whom Mr. Thomas F. Moore, Jr., New York City, was on the brief, for petitioner.
 Mr. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, with whom Messrs. John C. Mason, Deputy Gen. Counsel, Federal Power Commission, and Joseph B. Hobbs, Atty., Federal Power Commission, were on the brief, for respondent. Mr. Howard E. Wahrenbrock, Asst. Gen. Counsel, Federal Power Commission, also entered an appearance for respondent.
 
 
 1
 Mr. John R. Davison, Albany, N. Y., a member of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, for intervenor, People of the State of New York. Mr. Henry H. Fowler, Washington, D. C., also entered an appearance for intervenor, People of the State of New York.
 
 
 2
 Mr. Lawrence Potamkin, Washington, D. C., was on the brief for intervenor, Oneida Madison Electric Cooperative, Inc., and certain other intervenors.
 
 
 3
 Mr. T. Carl Nixon, Rochester, N. Y., was on the brief for intervenor, Rochester Gas and Electric Corporation.
 
 
 4
 Messrs. Northcutt Ely, Robert L. McCarty, C. Emerson Duncan II, and Charles F. Wheatley, Jr., Washington, D. C., were on the brief for intervenors, American Public Power Association, and the City of Jamestown, New York.
 
 
 5
 Before EDGERTON, Chief Judge, and BAZELON and BASTIAN, Circuit Judges.
 
 
 6
 BAZELON, Circuit Judge.
 
 
 7
 Petitioner, an agency of the State of New York, applied to the Federal Power Commission for a license to construct a power project to utilize all of the Niagara River water which, under the 1950 treaty between the United States and Canada,[1] is available for American exploitation.
 
 
 8
 In consenting to the treaty, the Senate had attached the following "reservation":
 
 
 9
 The United States on its part expressly reserves the right to provide by Act of Congress for redevelopment, for the public use and benefit, of the United States share of the waters of the Niagara River made available by the provisions of the treaty, and no project for redevelopment of the United States share of such waters shall be undertaken until it be specifically authorized by Act of Congress. [1 U.S.T. 694, 699.]
 
 
 10
 The Commission dismissed petitioner's application on November 30, 1956, in an opinion and order declaring:
 
 
 11
 "In the absence of the treaty reservation we would act on the Power Authority's application in accordance with the provisions of the Federal Power Act [16 U.S.C.A. § 791a et seq.] But if we are to accept the injunction of the reservation as it stands, we would have no authority to consider the application of the Power Authority on its merits. * * *
 
 
 12
 "Since the reservation here was intended by the Senate as part of the treaty and was intended to prevent our jurisdiction attaching to the water made available by the treaty, it is entirely authoritative with us as the Supreme Law of the Land under Article VI of the Constitution. * * *
 
 
 13
 "We are without authority to issue a license for the redevelopment (Project No. 2216) proposed by the Power Authority of the State of New York."
 
 
 14
 An application for rehearing was denied on January 2, 1957, and petitioner brought this review proceeding.
 
 
 15
 The parties agree that, if the reservation to the 1950 treaty is not "Law of the Land," the order should be set aside. Since the reservation did not have the concurrence of the House of Representatives, it is not "Law of the Land" by way of legislation.[2] The question is whether it became "Law of the Land" as part of the treaty.
 
 
 16
 The Commission argues that the reservation is an effective part of the treaty because: (1) it was a condition of the Senate's consent to the ratification of the treaty; (2) the condition was sanctioned by the President, was "accepted" by Canada, and was included in the exchange of ratifications; and (3) it "thus became a part of the Treaty." Simple as this argument seems, we cannot agree with it.
 
 
 17
 The treaty was signed on behalf of the United States and Canada on February 27, 1950. It defined the quantity of Niagara River water which was to be available for power purposes and provided that it "shall be divided equally between the United States of America and Canada." How each party was to exploit its share of the water was left for that party to decide.
 
 
 18
 In transmitting the treaty to the Senate on May 2, 1950, the President pointed out that the treaty did not determine how the United States was to exploit its share of the water. He said:
 
 
 19
 "* * * It is a question which we in the United States must settle under our own procedures and laws. It would not be appropriate either for this country or for Canada to require that an international agreement between them contain the solution of what is entirely a domestic problem."[3]
 
 
 20
 The Foreign Relations Committee of the Senate agreed that the question was "domestic in nature" and "concerns the United States constitutional process alone." It recommended the reservation because, without it, "the redevelopment for power purposes would be governed by the Federal Power Act. The Committee intends by the reservation to retain that power in the hands of Congress."[4] The Senate accepted the Committee's recommendation and consented to the ratification of the treaty with the reservation on August 9, 1950.[5]
 
 
 21
 Meanwhile, the Canadian Parliament had approved the treaty as signed, without the reservation. In a note on August 17, 1950, the Legal Advisor of the Department of State called the attention of the Canadian Government to the Senate action, saying:
 
 
 22
 "It appears that, while recognizing the subject matter of the reservation as domestic in nature and concerning the United States constitutional process alone, the Senate considered the reservation necessary in order to make certain that implementation of the treaty on the part of the United States would be made only by specifically authorized acts of Congress and would not be governed by the Federal Power Act."
 
 
 23
 A week later, without waiting for Canadian reaction to the reservation, the President ratified the treaty subject to the reservation. On September 21, 1950, the Canadian Ambassador, replying to the State Department's note, advised that his government accepted the reservation and would indicate its acceptance "by a statement to be included in the Protocol of exchange of ratifications." Two weeks later, without resubmitting the treaty to Parliament for approval of the reservation, the Canadian Government ratified the treaty. In the Protocol, on October 10, 1950, Canada inserted the following statement:
 
 
 24
 "Canada accepts the above-mentioned reservation because its provisions relate only to the internal application of the Treaty within the United States and do not affect Canada's rights or obligations under the Treaty."
 
 
 25
 The Canadian view that the reservation was of purely domestic concern to the United States and of no concern to Canada was shared, as we have shown, by the President, the Department of State and the Senate.
 
 
 26
 Unquestionably the Senate may condition its consent to a treaty upon a variation of its terms. The effect of such a "consent," by analogy to contract law, is to reject the offered treaty and to propose the variation as a counter-offer which will become a binding agreement only if accepted by the other party.[6] But, if what the Senate seeks to add was implicit in the original offer, the purported "conditional acceptance" is an acceptance and the contract arises without a further acceptance by the other party being required. Restatement, Contracts § 60, comment a (1932). The disposition of the United States share of the water covered by this treaty was, even apart from the reservation, something "which we in the United States must settle under our own procedures and laws." The reservation, therefore, made no change in the treaty. It was merely an expression of domestic policy which the Senate attached to its consent. It was not a counter-offer requiring Canadian acceptance before the treaty could become effective. That Canada did "accept" the reservation does not change its character. The Canadian acceptance, moreover, was not so much an acceptance as a disclaimer of interest. It is of some significance in this regard that the Canadian Government, although it had submitted the original treaty to the Parliament for its approval, found it unnecessary to resubmit the treaty to Parliament after the reservation was inserted. Also significant is the fact that the President ratified the treaty with the reservation without even waiting for Canada to "accept."
 
 
 27
 A true reservation which becomes a part of a treaty is one which alters "the effect of the treaty in so far as it may apply in the relations of [the] State with the other State or States which may be parties to the treaty." Report of the Harvard Research in International Law, 29 Am.J. Int'l L. Supp. 843, 857 (1935). It creates "a different relationship between" the parties and varies "the obligations of the party proposing it * * *" 2 Hyde, International Law, Chiefly As Interpreted and Applied by the United States (2d revised ed. 1945) 1435; International Law Commission, 2d Sess., Report on the Law of Treaties by J. N. Brierly, U.N. Doc. A/CN. 4/23, 14 April 1950, pp. 41, 42-43. The purported reservation to the 1950 treaty makes no change in the relationship between the United States and Canada under the treaty and has nothing at all to do with the rights or obligations of either party. To the extent here relevant, the treaty was wholly executed on its effective date. Each party became entitled to divert its half of the agreed quantum of water. Neither party had any interest in how the share of the other would be exploited, nor any obligation to the other as to how it would exploit its own share. The Senate could, of course, have attached to its consent a reservation to the effect that the rights and obligations of the signatory parties should not arise until the passage of an act of Congress. Such a reservation, if accepted by Canada, would have made the treaty executory. But the Senate did not seek to make the treaty executory. By the terms of its consent, the rights and obligations of both countries arose at once on the effective date of the treaty. All that the Senate sought to make executory was the purely municipal matter of how the American share of the water was to be exploited.
 
 
 28
 A party to a treaty may presumably attach to it a matter of purely municipal application, neither affecting nor intended to affect the other party. But such matter does not become part of the treaty. The Republic of New Granada, in 1857, attached such purely municipal matter to its ratification of a treaty with the United States. The President of the United States treated the added articles as being no part of the treaty. He ratified the treaty without resubmitting it to the Senate, stating in the Protocol of Exchange of Ratifications:
 
 
 29
 "* * * considering the said articles as in no way affecting the provisions of the said Treaty, but as being acts simply of domestic legislation[7] on the part of the Granadian Confederacy, and as implying no reciprocal obligation on the part of the United States, the said exchange has this day been effected in due form. [Miller, Reservations To Treaties (1919) 27.]"
 
 
 30
 The constitutionality of the reservation as a treaty provision was extensively argued by the parties. The respondent merely suggests that "there is no apparent limit" to what may be done under the treaty power, citing State of Missouri v. Holland, 1920, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641. Intervenor Rochester Gas and Electric Corporation puts the proposition more baldly. It defends this reservation as an "exercise of the treaty-making power to legislate in the domestic field * * * ," calling our attention to the fact that the Supreme Court has never held a treaty provision unconstitutional.[8] But it has been pointed out that the Court has never had occasion to consider a treaty provision which "lacked an obvious connection with a matter of international concern." 2 Hyde, International Law, Chiefly As Interpreted and Applied By The United States (2d revised ed. 1945) 1401. The instant reservation is sui generis. There is complete agreement by all concerned that it relates to a matter of purely domestic concern.
 
 
 31
 In State of Missouri v. Holland, 252 U.S. at page 433, 40 S.Ct. at page 383, Mr. Justice Holmes questioned, but did not decide, whether there was any constitutional limitation on the treaty-making power other than the formal requirements prescribed for the making of treaties.[9] The treaty he sustained related to a "national interest of very nearly the first magnitude" which "can be protected only by national action in concert with that of another power." Id., 252 U.S. at page 435, 40 S.Ct. at page 384. And it conferred rights and imposed obligations upon both signatories. Id., 252 U.S. at page 431, 40 S.Ct. at page 383. The treaty power's relative freedom from constitutional restraint, so far as it attaches to "any matter which is properly the subject of negotiation with a foreign country," Ware v. Hylton, 1796, 3 Dall. 199, 1 L.Ed. 568, is a long-established fact. Geofroy v. Riggs, 1890, 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642. No court has ever said, however, that the treaty power can be exercised without limit to affect matters which are of purely domestic concern and do not pertain to our relations with other nations.
 
 
 32
 Our present Secretary of State has said that the treaty power may be exercised with respect to a matter which "reasonably and directly affects other nations in such a way that it is properly a subject for treaties which become contracts between nations as to how they should act"; and not with respect to matters "which do not essentially affect the actions of nations in relation to international affairs, but are purely internal."[10] He had earlier said:
 
 
 33
 "* * * I do not believe that treaties should, or lawfully can, be used as a device to circumvent the constitutional procedures established in relation to what are essentially matters of domestic concern.[11]"
 
 
 34
 Charles Evans Hughes, just before he became Chief Justice and after he had been Secretary of State, addressing himself to the question whether there is any constitutional limitation of the treaty power, said:
 
 
 35
 "* * * The Supreme Court has expressed a doubt whether there could be any such * * *. But if there is a limitation to be implied, I should say it might be found in the nature of the treaty-making power.
 
 
 36
 "* * * The power is to deal with foreign nations with regard to matters of international concern. It is not a power intended to be exercised, it may be assumed, with respect to matters that have no relation to international concerns. * * the nation has the power to make any agreement whatever in a constitutional manner that relates to the conduct of our international relations, unless there can be found some express prohibition in the Constitution, and I am not aware of any which would in any way detract from the power as I have defined it in connection with our relations with other governments. But if we attempted to use the treaty-making power to deal with matters which did not pertain to our external relations but to control matters which normally and appropriately were within the local jurisdiction of the States, then I again say there might be ground for implying a limitation upon the treaty-making power that it is intended for the purpose of having treaties made relating to foreign affairs and not to make laws for the people of the United States in their internal concerns through the exercise of the asserted treaty-making power.[12]
 
 
 37
 In the Dulles view this reservation, if part of the treaty, would be an invalid exercise of the treaty power. In the Hughes view, its constitutionality would be a matter of grave doubt. "The path of constitutional concern in this situation is clear." United States v. Witkovich, 1957, 353 U.S. 194, 77 S.Ct. 779, 783, 1 L.Ed.2d 765. We construe the reservation as an expression of the Senate's desires and not a part of the treaty. We do not decide the constitutional question.
 
 
 38
 It is argued that, since the reservation was a condition to the Senate's consent to the treaty, to deny effect to the condition vitiates the consent and thus invalidates the whole treaty. That argument, we think, was disposed of by the Supreme Court in New York Indians v. United States, 1898, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927. That case involved a treaty with certain Indian tribes. The Senate in its resolution of consent to the treaty, had attached certain amendments and declared that "the treaty shall have no force or effect whatever, * * * nor shall it be understood that the senate have assented to any of the contracts connected with it until the same, with the amendments herein proposed, is submitted and fully and fairly explained by a commissioner of the United States to each of said tribes or bands, separately assembled in council, and they have given their free and voluntary assent thereto * * *." Id., 170 U.S. at pages 21-22, 18 S.Ct. at page 536. The amendments which the Senate attached to its resolution consenting to the treaty, as the Supreme Court recognized, were not communicated to the Indian tribes. The Court concluded that the amendments were not part of the treaty. It nevertheless treated the Senate's consent as effective to make the treaty valid and operative. Id., 170 U.S. at pages 22-24, 18 S.Ct. at page 536.
 
 
 39
 The order under review is set aside and the case remanded to the Federal Power Commission.
 
 
 40
 It is so ordered.
 
 
 
 Notes:
 
 
 [1]
 Treaty Between the United States and Canada Concerning Uses of the Waters of the Niagara River, Feb. 27, 1950, 1 U.S.T. 694
 
 
 [2]
 New York Indians v. United States, 1898, 170 U.S. 1, 23, 18 S.Ct. 531, 42 L.Ed. 927; Fourteen Diamond Rings v. United States, 1901, 183 U.S. 176, 184, 22 S.Ct. 59, 46 L.Ed. 138, concurring opinion of Mr. Justice Brown
 
 
 [3]
 Senate Executive N, 81st Cong., 2d Sess. 3
 
 
 [4]
 S.Exec.Rep. No. 11, 81st Cong., 2d Sess. 7
 
 
 [5]
 96 Cong.Rec. 12095
 
 
 [6]
 "A reservation is upon analysis the refusal of an offer and the making of a fresh offer." 1 Oppenheim, International Law (8th ed., Lauterpacht, 1955) 914
 
 
 [7]
 Under our Constitution, of course, such matter added to a treaty cannot be effective as legislation. Supra note 2
 
 
 [8]
 But cf. United States v. Guy W. Capps, Inc., 4 Cir., 1953, 204 F.2d 655, affirmed on other grounds, 1955, 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329
 
 
 [9]
 The question raised by Mr. Justice Holmes was given an affirmative answer by Mr. Justice Black in Reid v. Covert, 77 S.Ct. 1222
 
 
 [10]
 Hearings on S.J.Res. 1 Before a Subcommittee of the Senate Judiciary Committee, 84th Cong., 1st Sess. 183 (May 2, 1955)
 
 
 [11]
 Hearings on S.J.Res. 1 and S.J.Res. 43 Before a Sub-committee of the Senate Judiciary Committee, 83d Cong., 1st Sess. 825 (April 6, 1953)
 
 
 [12]
 Proceedings of The American Society of International Law (1929) 194, 196
 
 
 
 41
 BASTIAN, Circuit Judge (dissenting).
 
 
 42
 Petitioner, Power Authority of the State of New York, petitions under § 313 (b) (16 U.S.C.A. § 825l) of the Federal Power Act to set aside the whole of an order of the respondent, Federal Power Commission. That order dismissed petitioner's application for license under § 4 (e) (16 U.S.C.A. § 797(e) of the Federal Power Act for a power project. The application was for a license for a proposed hydro-electric development, including facilities for the diversion from the Niagara River of all of the water available under the 1950 Treaty between the United States and Canada.
 
 
 43
 Being doubtful of its power to act on the application for license because of a reservation made in the treaty as a condition to the advice and consent of the United States thereto, the Commission heard oral argument on the application of the 1950 Treaty and the reservation. Thereafter, finding itself without authority to issue a license for the project, the Commission ordered the application dismissed.
 
 
 44
 Petitioner filed application for rehearing, which was denied by the Commission's order of January 2, 1957; whereupon, the present petition for review was filed.
 
 
 45
 The facts are largely undisputed and appear in the opinion and order of the Commission dismissing the application for license, as follows:
 
 
 46
 "The application proposes a project which, briefly, would consist of an intake structure located about three miles above the falls on the Niagara River, two covered conduits extending about 4.5 miles from the intake around the falls to a proposed pumping-generating plant and reservoir at Lewiston, New York, an open canal by which the water will be carried about one mile from the pumping-generating plant and reservoir to the main power-house, which is also located at Lewiston at the edge of the river and consists of intake structures on the top of the cliff, and a generating station at the bottom of the cliff containing thirteen 150,000 kw units.
 
 
 47
 "Up to now power development on the American side at Niagara Falls has been under the authority of a license issued on March 2, 1921, for Project 16 and now held by Niagara Mohawk Power Corporation. Niagara Mohawk's Schoellkopf generating station at the Falls was rendered inoperative by a rock slide on June 7, 1956, but the company has filed an application requesting authority to restore the station in part. The application of Power Authority proposes that if Niagara Mohawk will consent to the surrender of its license for Project 16 it will sell it an amount of power equivalent to that which it has hitherto produced by this project.
 
 
 48
 "Power Authority's proposal is designed to make use of all the water available under the 1950 treaty, the purpose of which was to preserve the beauty of Niagara Falls and to bring about the full use of the water resources of the Niagara River. The American share up to the time of the treaty had been only 32,500 cfs, made available under the treaty of 1909 and through subsequent exchanges of notes between the United States and Canada, and has been utilized, up to the time of the rock slide, by Niagara Mohawk's Project 16. The 1950 treaty increased this amount by providing that the United States and Canada should divide equally the water flowing in the Niagara River (with certain adjustments) less 50,000 cfs at certain times and 100,000 cfs at other times, to preserve the beauty of the Falls.
 
 
 49
 "When the Senate of the United States on August 9, 1950, advised and consented to the ratification of the 1950 treaty, it included the following reservation:
 
 
 50
 "The United States on its part expressly reserves the right to provide by Act of Congress for redevelopment, for the public use and benefit, of the United States' shares of the waters of the Niagara River made available by the provisions of the Treaty, and no project for redevelopment of the United States share of such waters shall be undertaken until it be specifically authorized by Act of Congress (1 UST 694, 699).
 
 
 51
 "Thereafter Canada accepted the reservation and on August 24, 1950, the treaty, including the reservation, was ratified by the President of the United States. It was ratified by Canada on October 5, 1950. Ratifications were exchanged at Ottawa on October 10, 1950. The treaty was proclaimed by the President on October 30, 1950, and entered into force October 10, 1950."
 
 
 52
 On these facts the Commission very properly concluded that it had no power to determine the constitutionality of an act of Congress, and ruled:
 
 
 53
 "Where, as here, there is action by the Senate, which was ratified by the President purportedly under the treaty-making power of the Constitution, we likewise cannot determine its validity and this is especially true since the action is that of the legislative branch of the government, of which we are an arm and of whose intention we can have no doubt."
 
 
 54
 There is no doubt that a treaty is not only a contract between sovereign nations but may contain provisions which affect local law within the nation. State of Missouri v. Holland, 1920, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641. The Senate, in connection with its treaty-making powers,[1] is not a mere rubber stamp for the executive. It is true that ordinarily it is the President who originates treaties and negotiates with a foreign nation but he is unable to conclude such treaties without the advice and consent of the Senate. The Senate has the duty of both "advice" and "consent". Both of these terms are important and were so deemed by our founding fathers. Consequently, the Senate has the right to advise reservations and amendments to a proposed treaty and has done so on many occasions. Thus, in the original United States-Canadian Boundary Waters Treaty of 1909 the Senate proposed, and there was adopted, an amendment of understanding. In fact, the Jay Treaty of 1794,[2] the first made by this country after the adoption of the Constitution, was not consented to by the Senate as originally proposed. Instead, the Senate advised and consented to ratification only after an amendment of the proposed terms of the treaty.
 
 
 55
 The treaty involved here was, as usual, originally sent by the President to the Senate. The Senate advised and consented to ratification upon conditions set out in the reservation. Canada accepted the reservation and, thereafter, on August 24, 1950, the President ratified the treaty as conditioned by the Senate. Canada ratified on October 5, 1950, and the reservation was included in the protocol evidencing the exchange of ratification by the United States and Canada.
 
 
 56
 * Petitioner argues, and the majority holds, that what was called a reservation by the Senate, the President, State Department officials, and the Canadian Government, was not truly a reservation, but merely a declaration of Senatorial policy which has no binding effect. The basis of this argument is that standing alone, without considering other factors, the reservation was a matter of domestic concern having no effect on the rights and duties of the sovereign parties to the treaty, whereas a valid reservation must alter the rights and duties of the parties under the treaty as originally proposed. No need exists for an esoteric discussion of whether the language in question conforms to the scholar's definition of a treaty reservation. If the Senate conditioned its advice and consent to the treaty upon inclusion of the language in question and upon its being given an operative effect — if the Senate did so condition its consent — if the condition was a sine qua non to its consent and to ratification — if but for its condition being given effect the Senate would not have consented to the treaty — then regardless of what the language in question is called it must be given effect. Believing this to be the only proper approach to petitioner's contention, I would dispose of that contention by determining the intent of the Senate when it insisted upon inclusion of the language in question in the treaty.
 
 
 57
 As will be shown in more detail later, the Senate was aware, at the time the treaty was submitted, of pending legislation relative to the development of water-power resources of the Niagara River.[3] It was likewise aware that if the treaty was ratified as written the additional water power available for exploitation by this country would be developed pursuant to the Federal Power Act, supra.[4] Whether it should be developed pursuant to that Act or according to the terms of later legislation was a matter of considerable concern to the Senate. If the language of the reservation does not make this clear, and I think it does, then the report of the Senate Foreign Relations Committee does.[5] There is no reasonable construction of the plain language of the reservation or of its legislative history other than this: The Senate desired to consent to the proposed treaty, but not at the expense of foreclosing from the consideration and decision of the Congress at large the question of how the water power would be developed. We should not assume that this reservation, arising from due deliberation, was an idle gesture. Its language is straightforward and to the point. Its meaning is clear. I do not see how we can avoid giving effect to it according to its terms. Of course, if the reservation was beyond the constitutional power of the Senate, it cannot be given effect. If it is beyond the power of the Senate, then not just the reservation falls, but the entire treaty. How can it be otherwise when the Senate has made it abundantly clear that without the reservation it would not have consented to the treaty?[6]
 
 
 58
 No authority can be found for holding a treaty valid while rendering a Senatorial reservation to it nugatory. New York Indians v. United States, 1898, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927, referred to by petitioner, certainly does not do so and has no application to the case before us. In New York Indians, the Senate proviso was never incorporated in the text of the treaty; it was not contained in the original or published copy of the treaty; nor was it contained in the Presidential proclamation of the treaty. The Supreme Court indicated that it believed the Senate resolution in question was "mainly directory" and stated "* * * it is difficult to see how it can be regarded as part of the treaty, or as limiting at all the terms of the grant."[7] The Court also pointed out that there was no evidence that the Senate amendment of the proposed treaty had ever had the sanction or approval of the President.
 
 
 59
 Even if the proviso in the Indian treaty were intended as a reservation, that case is clearly distinguishable in important particulars. There the United States sought to invoke the reservation to the detriment of the other parties to the treaty. Also, the United States was doing so despite the fact that the other parties had acted on the basis of the treaty as proclaimed and had no knowledge of the proviso. The Court said that to permit the United States to invoke the proviso "shocks the conscience."[8] This is the language of an estoppel. Upholding a treaty while declaring void a reservation such as this one, and upholding a treaty while estopping the government from asserting an uncommunicated reservation are entirely different situations. Certainly the latter is not authority for the propriety of the former.
 
 
 60
 Enough has been said already to indicate my disagreement with a holding that the reservation is not a part of the treaty and that the treaty is effective without it.
 
 II
 
 61
 Before turning to petitioner's argument that the reservation in question is beyond the Senate's constitutional power it is important to carefully delineate what is not before the court in this case. Doing so should be an aid to a proper understanding of what is. First, the Senate has not by its reservation sought to extort as its price for ratifying the treaty that it be allowed, independently of the Congress at large, to determine the nature and status of domestic legislation or policy. It has not provided that its conditional ratification is to be regarded as withdrawn if the Federal Power Act is ever applied to the water in question. It has merely left the question as to whether that Act or some other should be applied open to determination of both houses of Congress and the President. It has not demanded its way. Its reservation is not self-serving, but purports to extend to the Congress and the President a voice in determining how the increased water supply will be developed. This then is a case where the Senate has not sought to limit the participation of the Congress at large and the President in decisions regarding domestic policy. It is a case in which the Senate has sought to enlarge their participation.
 
 
 62
 Secondly, this is not a case in which the Senate has exacted as a price for its ratification of a treaty that some new, nonexisting legislation become law. Nor is it a situation where ratification is conditioned on nonapplication of some general statute not germane to the subject matter of the treaty.[9]
 
 
 63
 This is simply a case where the Senate has conditioned ratification upon the nonapplication of the Federal Power Act to the additional water supply made available by the treaty, and provided that decision as to how and by whom that resource is to be developed shall be held in abeyance.[10] These are matters directly germane to the subject matter of the treaty. This is the only case before this court. Those other situations can well await decision in cases where they are presented. The grave constitutional issues they present should not prejudice or cause us to pre-judge this case.
 
 
 64
 I must disagree with the implication in the majority opinion that this reservation, if a part of the treaty, would be invalid. The majority say the reservation is not a part of the treaty. There is a definite suggestion that their conclusion is influenced, if not dictated, by a belief that if the reservation were construed as a part of the treaty, then the treaty would be unconstitutional. I can appreciate the majority's reluctance to hand down the first decision invalidating a treaty of the United States. But I cannot, as indicated above, agree that the reservation is not an essential part of the treaty. Nor can I agree that its being a part of the treaty renders the treaty invalid. We are told that the reservation is void because it is regarded as of "purely domestic concern" and therefore not a valid subject matter for a treaty reservation. It is elementary law that treaties may and frequently do affect domestic concerns. Indeed, treaties may repeal previous municipal law passed by the Congress or by state legislatures.[11] Therefore, if this reservation is void, it is not because it affects domestic law to the extent that it requires that the Federal Power Act not apply to the additional water power made available by the treaty.
 
 
 65
 If void, it must be because the reservation is not only of domestic concern, but is also remote from the valid subject matter of the treaty, and is not inspired by consideration of or pertinent to international relations or policy. While it is true that the President and officials of the Department of State have referred to the question of how the water power made available by the treaty was to be exploited as a matter of domestic concern, certainly that question is not remote from but is germane to the subject matter of the treaty. At the time the treaty was submitted to the Senate for ratification, the question of how and by whom water-power resources of the Niagara River would be exploited was a controversial issue in the Congress. With this controversy in mind, the Senate Foreign Relations Committee, in its report on the treaty, pointed out that extensive public hearings on implementing legislation would probably be necessary. The Committee recognized that it would take considerable time to complete such hearings and to obtain final Congressional action on the pending legislation.[12] Yet the Committee and the Senate as a whole were reluctant to jeopardize the rights which this country would receive under the proposed treaty by delaying its ratification until after Congress had acted upon the pending legislation concerning Niagara River power development. Also, the Senate Committee report reflects a regard for our friendly relations with Canada and stated that prompt ratification of the treaty would "constitute a gesture of good will toward our friendly neighbor, Canada".[13] Another reason given by the Committee for its recommendation of prompt ratification with the suggested reservation was "in order to relieve the acute power shortage in Canada".[14]
 
 
 66
 Because of the possibility that the Canadians might in the absence of the treaty be compelled to take some unilateral action in harnessing the Niagara power, because undue delay might prejudice our good relations with Canada, and in view of an asserted acute power shortage in Canada requiring speedy ratification, this reservation was intimately and inseparably bound up in international questions. In this context it is not purely a domestic concern. If the subject matter of the reservation is domestic in nature, it was nonetheless inspired by, an outgrowth of, and inextricably connected with, an admittedly valid subject matter of a treaty. It is not required as a condition to validity that the reservation be in and of itself, treated in artificial isolation or detachment, a domestic matter properly a subject of contract between sovereigns. It is sufficient if it is directly related to a general subject which is properly a matter for contract between sovereigns, and if international policies and considerations are the raison d'être of the reservation. As no properly negotiated and ratified treaty of the United States has ever been held invalid there can be no binding judicial authority in support of petitioner's argument for unconstitutionality. Nor is there support in the dicta and comments of the text writers cited by petitioner for the proposition that a reservation or treaty to be valid must have a subject matter which independent of all other considerations is a matter of international concern. Petitioner quotes from Geofroy v. Riggs, 1889, 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642: "But, with these exceptions, [none of which are applicable here] it is not perceived that there is any limit to the questions which can be adjusted [by treaty] touching any matter which is properly the subject of negotiation with a foreign country." [Emphasis supplied] From another case[15] appellant quotes: "The treaty-making power * * * extends to all proper subjects of negotiation with foreign governments." Asakura v. City of Seattle, 1924, 265 U.S. 332, 341, 44 S.Ct. 515, 516, 68 L.Ed. 1041 is quoted as saying the treaty power extends "* * * to all proper subjects of negotiation between our government and other nations". Also quoted is language from Santovincenzo v. Egan, 1931, 284 U.S. 30, 40, 52 S. Ct. 81, 84, 76 L.Ed. 151, where the Court said the treaty power "* * * is broad enough to cover all subjects that properly pertain to our foreign relations * *" (Emphasis supplied) Other statements of like effect are quoted. In the first place each of these statements was written in emphasis of the extent of the treaty power, not in diminution of it. Furthermore, applying the criteria of these cases here does not dictate a conclusion that this reservation is invalid. Certainly in the language of Geofroy v. Riggs, supra, it "touches" a matter properly the subject of negotiation with a foreign government. Likewise it "properly pertains" to our foreign relations, to use the language of the Santovincenzo case.
 
 
 67
 Secretary of State Dulles is quoted by the majority as having stated that the treaty power may not be exercised with respect to matters "* * * which do not essentially affect the actions of nations in relation to international affairs, but are purely internal." [Emphasis supplied]
 
 
 68
 "* * * I do not believe that treaties should, or lawfully can, be used as a device to circumvent the constitutional procedures established in relation to what are essentially matters of domestic concern."
 
 
 69
 A former Secretary of State and Chief Justice, Charles Evans Hughes, is also quoted by the majority. That quotation in its essential part is:
 
 
 70
 "It [the treaty power] is not a power intended to be exercised, it may be assumed, with respect to matters that have no relation to international concerns. * * *" [Emphasis supplied]
 
 
 71
 However true these statements, they should not be regarded as support for finding this reservation invalid. It does not circumvent our constitutional processes; it does affect our international relations; it is related to an international concern.
 
 
 72
 As I believe this is the proper analysis of whether the reservation is valid, I can only conclude that it was a valid exercise of the Senate's power to consent to a treaty upon an express reservation being attached and given effect.
 
 III
 
 73
 My view that a reservation is valid if it is inspired by, an outgrowth of, and inextricably connected with, an admittedly valid subject matter of a treaty is not without historical precedent. One precedent which is contrary to petitioner's narrow view of the treaty power is the Webster-Ashburton Treaty of 1842. That treaty settled the northeast boundary of the United States and Canada. The agreement settling the boundary dispute gave to Canada some territory claimed by Maine and Massachusetts. As compensation to those states for the loss of the territory they had claimed, the federal government agreed to pay them a fixed sum of money. The terms of this agreement with the state governments was reflected in the language of the treaty in the following terms,
 
 
 74
 "* * * the Government of the United States agree[s] with the States of Maine and Massachusetts, to pay them the further sum of three hundred thousand dollars, in equal moieties, on account of their assent to the line of boundary described in this treaty, and in consideration of the conditions and equivalents received therefor, from the Government of Her Britannic Majesty."[16]
 
 
 75
 Lord Ashburton wrote to Daniel Webster that "the introduction of terms of agreement between the general government and the States [of the United States] would have been irregular and inadmissible, if it had not been deemed expedient to bring the whole of these transactions within the purview of the treaty. There may not be wanting analogous cases to justify this proceeding; but it seems proper that I should have confirmed by you that my government incurs no responsibility for these engagements * * *"[17]
 
 
 76
 Surely the agreement between the federal and state governments had in and of itself no bearing on the international rights and duties of the two contracting sovereigns. It in no way affected what the two nations gave or received as between themselves. Treated separately, in isolation from a matter which was a valid subject of a treaty, the provision referred to was entirely domestic and concerned our constitutional processes alone. Under petitioner's concept of the treaty powers, the quoted provision of the Webster-Ashburton Treaty would have been invalid and of no effect. Yet the Congress promptly appropriated the money obligated to Maine and Massachusetts without questioning the propriety of the treaty provision.[18]
 
 
 77
 In the treaty with Spain transferring Puerto Rico to this country, it was provided: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress."[19] Legally the political status of inhabitants of newly acquired territory is a question purely of domestic concern. It is a matter for our own constitutional processes. Any foreign interference in such matters would be grossly improper. When this treaty came before the Supreme Court in Downes v. Bidwell, 1901, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088, the issue was whether the Constitution imposed the same limitation on Congress in regard to Puerto Rico as it did to the states. The Court concerned itself with the power to incorporate new territories by treaty, and whether the terms of its incorporation could be fixed by treaty. In doing so the provision of the treaty quoted above was considered. Four justices questioned the power to establish the terms incorporating new territory by treaty alone, but specifically endorsed the provision in the treaty that the political status of the inhabitants of the new territory could be left by treaty to await later congressional enactment.[20] The opinion of Mr. Justice Brown, whose opinion was the judgment of the Court, recognized that a provision in a treaty governing the status of the inhabitants of the newly acquired territory was proper, and that a provision leaving the question of their status to later enactment was also valid.[21]
 
 
 78
 The recital of these two precedents, which are contrary to petitioner's narrow and conceptionalistic "contract" theory of the treaty power, should not be taken to imply a lack of other historical precedents, for such is not the case.
 
 
 79
 My colleagues recognize that the Senate could have made the treaty executory by providing in its consent that the rights and obligations of both signatory parties take effect only after passage of an act of Congress. They say, however, that the Senate did not do so. While I agree with this, I cannot agree that the Senate has no power to make the treaty executory as to this country alone.
 
 
 80
 There are many instances where the Senate has extended to the House of Representatives a voice in determining how treaties will be implemented. The Senate has on many occasions done this by insisting that a treaty not be effective until approved or implemented by an act of Congress. This is particularly so as regards treaties affecting revenues. 1 Willoughby, The Constitutional Law of the United States, 558-560 (2d ed. 1929). It is also worthy of note that denial of House participation in domestic legislation effectuated by treaty has been one of the most common causes of controversy over the treaty power.
 
 
 81
 It is my view that recognition of the Senate's power to condition its consent to a treaty upon its remaining executory on both sides until Congress passes legislation to give the treaty operative effect carries with it recognition that the Senate may condition its consent upon the treaty not having an operative effect in this country alone until Congress acts. In either event the treaty rights and duties are the same. In one instance both parties are bound to await an act of Congress before exercising their rights under the treaty, whereas in the second instance, which is the case here, only this country is bound to await an act of Congress before availing itself of the rights allotted by the treaty. Why cannot the Senate make the reduction to use of the treaty rights by the United States await an act of Congress? The Senate had no desire to delay Canadian implementation of the treaty; indeed, it recognized that good relations with Canada required that this country not postpone Canadian power development. I see no reason why the Senate must delay our Canadian friends in order to make reduction to use of our water rights under the treaty await congressional enactment.
 
 
 82
 For compelling practical reasons, based upon international considerations requiring that Canadian execution of the treaty not be delayed, the Senate consented to the treaty on condition that it remain executory until Congress at large had acted. The Senate has, in the only way it could under the circumstances, sought to insure full legislative determination of a serious domestic issue. I can conceive of no practical objection to this, nor has any been pointed out to me.
 
 
 83
 While I do not agree with petitioner's narrow contract theory, even if it is correct I nonetheless do not believe it would make this reservation invalid. Petitioner maintains that to be a valid subject matter of a treaty the subject must, standing alone, be a matter of concern to the sovereign parties, and be a proper subject of contract between the parties. I regard this reservation as within that narrow classification. This can be demonstrated with the aid of a realistic assumption of fact.
 
 
 84
 The text of the treaty indicates the great concern of Canada and our country for not diminishing the scenic beauty of Niagara Falls.[22] This concern was the impetus of this and the earlier treaty concerning Niagara River water power.[23] Assume there was no Federal Power Act or that by that Act's terms it was inapplicable to the Niagara River. Having a legitimate interest in the scenic attraction of Niagara Falls, Canada might well be unwilling to agree to making more water power available if it feared unregulated, irresponsible exploitation of the water resources of the river. Such exploitation might very well be regarded as a menace to the economic and aesthetic interest of Canada in Niagara Falls. Under this assumption, how the water power made available to the United States would be developed would be a matter of prime importance to Canada. That concern might, in the situation assumed, induce Canada to insist upon our share of the water being harnessed subject to regulations protective of the scenic beauty of Niagara Falls. If it be conceded, as I think it must be, that how we develop water-power resources obtained by treaty may be a matter of concern to Canada and not purely a domestic concern, then the reservation in question is within the narrow confines of the treaty power as petitioner views it.
 
 
 85
 That the Senate and not Canada proposed this reservation does not change the subject matter, but that is the test petitioner proposes. The identity of the party making a proposal cannot change its nature or subject matter. It is still the same proposal. That there is a Federal Power Act and that, but for the reservation, it would apply does not alter the subject matter of the reservation. The existence or nonexistence of domestic legislation is clearly not a test of the treaty power. Nor does it change the subject matter of a reservation.
 
 
 86
 Thus, under a simple and realistic assumption, the reservation can be established as a proper matter for negotiation and contract between sovereigns. Then, even under petitioner's view, it is valid. There is a further basis for attributing to Canada an interest in the reservation. Every party to a proposed treaty which it has negotiated has an interest in that treaty being ratified. If it believes that inclusion of certain terms will win ratification, and non-inclusion would bar ratification by the other party, then those terms are of concern to it. Here Canada did not for these reasons propose the terms of the reservation in question; but it has the same interest in this reservation as if it had done so. This is merely because without the reservation Canada would have had no treaty.
 
 
 87
 To say that this reasoning is incorrect because Canada did not propose the terms of the reservation is to say that certain terms proposed by a foreign government are the valid subject matter of a treaty, and may affect domestic law, while the same terms included at the insistence of the Senate are invalid because they do not have a valid subject matter. Is not the subject matter the same regardless of who proposed it? Is not the effect on domestic law the same? Is there any basis for achieving a different result except perhaps for theoretical, abstruse or academic reasons? I do not believe the constitutional power to make treaties should be restricted for such reason when every practical, realistic consideration favors the power to do what the Senate and the President have done here.
 
 Conclusion
 
 88
 It may well be that, no matter how broad the power to make treaties, it is not without limits; and that, like any other power, it can be abused. This case, however, does not pose an abuse of the treaty power. The reservation in question is an instance of self-denial, not usurpation. It does not subvert our constitutional system. It was motivated by a desire that the treaty power should not be used in a manner which would exclude the Congress at large and the President from playing their normal roles in making domestic law.
 
 
 89
 Unless it can be said that petitioner has a right to have the Senate not make treaties executory in their internal operation, no one is legally injured. Whether treaties should be thus executory seems strictly a political question. Clearly, it is as political a matter as whether the President chose to negotiate a treaty or whether the Senate chose to consent to a treaty negotiated. It would seem that it would be time enough to describe the limits of the treaty power when a case arises where our constitutional scheme of government is subverted, or where there is some usurpation of power, or where what is done under the treaty power is adverse to a legal right of some person or entity.[24]
 
 
 90
 If petitioner's narrow view of the treaty power is approved by the courts, it would constitute an unfortunate limitation on that power. If the language of the Constitution, the nature of the governmental system it contemplates, or binding judicial authority supported petitioner's theory, its validity would have to be recognized and its effects endured. But there is no support for that theory in our charter of government, nor does it find support in the nature of our political system. There are no judicial authorities favoring that theory.
 
 
 91
 These reasons being absent, I cannot, on the basis of theory, dicta and textbook definitions, narrowly circumscribe the signally important power to make treaties.
 
 
 
 Notes:
 
 
 [1]
 U.S.Const. Art. II, § 2
 
 
 [2]
 8 Stat. 116 (1794), 1 Malloy Treaties, 590 (1910)
 
 
 [3]
 Senate Executive Report No. 11, 81st Cong., 2d Sess. 6-7 (1950)
 
 
 [4]
 Id. at 7
 
 
 [5]
 Id. at 6, 7
 
 
 [6]
 Id
 
 
 [7]
 170 U.S. at page 23, 18 S.Ct. at page 536
 
 
 [8]
 Ibid
 
 
 [9]
 For example, that the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq. or the Walsh-Healy Act, 41 U.S.C.A. § 35 et seq. not be applied to employers and employees engaged in development of the water rights obtained pursuant to the treaty
 
 
 [10]
 Of course this would leave the Congress free to provide by legislation, if it chooses, that the Federal Power Act should apply
 
 
 [11]
 Cases recognizing this are: Cook v. United States, 1933, 288 U.S. 102, 103, 53 S.Ct. 305, 77 L.Ed. 641; Whitney v. Robertson, 1888, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386; The Cherokee Tobacco, 1870, 11 Wall. 616, 78 U.S. 616, 20 L.Ed. 227; Foster v. Neilson, 1829, 2 Pet. 253, 27 U.S. 253, 7 L.Ed. 415; Ware v. Hylton, 1796, 3 Dall. 199, 3 U.S. 199, 1 L.Ed. 568
 
 
 [12]
 See note 3 supra
 
 
 [13]
 Id. at 7
 
 
 [14]
 Id. at 6
 
 
 [15]
 In re Ross, 1891, 140 U.S. 453, 463, 11 S.Ct. 897, 900, 35 L.Ed. 581
 
 
 [16]
 8 Stat. 572, (1848); 1 Malloy, Treaties 650, 654 (1910)
 
 
 [17]
 6 Webster, Works 289 (1853)
 
 
 [18]
 5 Stat. 623 (1850)
 
 
 [19]
 30 Stat. 1754, 1759 (1899); 2 Malloy, Treaties 1688, 1693 (1910)
 
 
 [20]
 182 U.S. at page 312, 21 S.Ct. at page 796
 
 
 [21]
 Id., 182 U.S. at pages 279-280, 21 S.Ct. at page 784
 
 
 [22]
 Articles II and IV of the treaty
 
 
 [23]
 See Senate Executive Report No. 11, 81st Cong., 2d Sess. 3 and 5 (1950)
 
 
 [24]
 See The Treaty Makers and The Law Makers; The Niagara Reservation, an excellent and cogently reasoned discussion, by Louis Henkin, a member of the Columbia Law School faculty. 56 Columbia L.R. 1151