Louis ZEMEL, Plaintiff,

v.

Dean RUSK, Secretary of State, Department of State, and Robert F. Kennedy, Attorney General, Defendants.

No. 9549.

United States District Court
D. Connecticut.

Feb. 20, 1964.

J. Joseph Smith, Circuit Judge, and Blumenfeld, District Judge, dissented in part.

Leonard B. Boudin, Rabinowitz & Boudin, New York City, Samuel Gruber, Gruber & Turkel, Stamford, Conn., for plaintiff.

Benjamin C. Flannagan, Dept. of Justice, Washington, D. C., Robert C. Zampano, U. S. Atty., New Haven, Conn., for defendants.

Before J. JOSEPH SMITH, Circuit Judge, and CLARIE and BLUMEN-FELD, District Judges.

CLARIE, District Judge.

The plaintiff, a citizen of the United States and residing within this judicial district, has brought this action against Dean Rusk, Secretary of State of the United States and Robert F. Kennedy, the Attorney General of the United States for a declaratory judgment and to enjoin the enforcement and execution of two acts of Congress, namely, the Passport Act of 1926, 44 Stat. 887, 22 U.S.C. § 211a and § 215 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 190, 8 U.S.C. § 1185, both of which the plaintiff claims are repugnant to the Constitution. Jurisdiction of this Court is

invoked under Section 10 of the Administrative Procedure Act, 60 Stat. 243 (1946), 5 U.S.C. § 1009 and 28 U.S.C. §§ 1391 and 2201; and pursuant to 28 U.S.C. §§ 2282 and 2284 a three-judge court was convened to pass upon the constitutional questions in issue.

Cross motions have been filed by the respective parties, pursuant to Rule 56, Fed.R.Civ.P., for the entry of summary judgment based on the representation of both parties that there exists in this case no genuine issue as to any material fact. Having heard the arguments of counsel for the respective parties and having considered their amended pleadings, affidavits, briefs and other papers on file, the Court is of the opinion that the plaintiff's motion for summary judgment should be denied and the defendants' motion for summary judgment should be granted.

The material facts are undisputed. On March 31, 1962, while the plaintiff was the holder of a valid United States passport of standard form and duration, he applied by letter to the Director of the Passport Office at Washington, D. C., for permission to have his passport validated for travel to Cuba as a tourist. The Passport Office denied him the permission requested, with the explanation that only persons whose travel might be in the best interests of the United States, such as newsmen and businessmen with previously established interests, could be eligible; and specifically that tourist travel was excluded. Thereafter, on May 1, 1962, the petitioner requested a hearing on his application without reciting any new reason, except that he felt justified in wanting to make the trip. He was sent a copy of the current Administrative Procedures of the Passport Office and advised by the acting Deputy Director, citing 22 C.F.R. 51.170 (1958), that in those instances where foreign travel was restricted by geographical limitations, which were generally applicable to everyone, no administrative procedures for review or appeal were provided. Subsequently, on October 11, 1962, the petitioner through his attorney advised the Pass-

port Office by letter, that the former had acquired a new passport and renewed petitioner's request for its validation and a review of any denial. The department advised counsel that in view of the lapse of time, since filing the original application, a new application should be filed, setting forth the purpose of the trip, his expected duration in Cuba, his address while there and assurance of his willingness to register with the Swiss Consulate upon his arrival in Havana.

Thereupon, the petitioner filed a new application for validation, wherein he represented that the purpose of his trip to Cuba was to satisfy his curiosity about the state of affairs in Cuba in order to make him a better informed citizen. He represented further, that he expected to stay at the Havana Libre Hotel for approximately two or three weeks and expressed his willingness to register with the Swiss Consulate upon his arrival in Havana.

On November 5, 1962, the petitioner was notified by the Deputy Director of the Passport Office that his "present purpose of visiting Cuba does not meet the standards for validation of your passport." It should be emphasized that at the time of the Court's hearing on this motion, petitioner's counsel stated that he was making no claim of illegality on the basis of his client's not having been afforded an administrative hearing with reference to the denial of the passport validation and this Court will therefore consider that he has abandoned any claim of illegality on this ground, notwithstanding its recitation in the complaint.

It is the plaintiff's contention that the Passport Act of 1926, 44 Stat. 887, 22 U.S.C. § 211a does not authorize the action taken, that said Act and § 215 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 190, 8 U.S.C. § 1185 are unconstitutional, because they interfere with the rights of a citizen, in this instance the plaintiff, to the right to travel under the Fifth, Ninth and Tenth Amendments; to the freedom of speech, belief and association under the First Amendment and that it is an arbitrary

and unreasonable denial of due process under the Fifth Amendment; further, that it is an invalid delegation of legislative power because it does not contain adequate standards and safeguards. The petitioner claims that Executive Order 7856 and Presidential Proclamation 3004, 67 Stat. c. 31 fail to provide adequate standards to guide the Secretary of State in promulgating the regulations and giving proper notice to the American citizen whether said regulations are supported by statute or proclamation; and to the extent that the denial rests upon Executive power over foreign relations, it is still subject to constitutional limitations, and the reasons given by the Secretary do not warrant this abridgement.

The plaintiff presently prays for a declaratory judgment and an injunction decreeing that § 215 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 190, 8 U.S.C. § 1185 and the Passport Act of July 3, 1926, 44 Stat. 887, 22 U.S.C. § 211a are unconstitutional and that the Secretary of State's regulations,[1] restricting travel to Cuba are thus without any authority in law and are invalid as to the plaintiff. He also requests that the Secretary of State be directed to validate the petitioner's passport for travel to Cuba, and that he and the Attorney General of the United States be enjoined from interference with his prospective travel or instituting any criminal procedure by reason thereof when consummated.

## THE THREE-JUDGE COURT ISSUE

The preliminary jurisdictional question is whether this proceeding should be heard by a three-judge District Court pursuant to 28 U.S.C. § 2282. This statute requires such a tribunal as a prerequisite to the granting of any "interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution * * *." The necessary elements for the convocation of such a court are three-fold: (1) The complaint must allege a basis for equitable relief, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); (2) The constitutional question raised must be substantial. Schneider v. Rusk, 372 U.S. 224, 83 S.Ct. 624, 9 L.Ed.2d 695 (1963); and (3) The Complaint must assail an 'Act of Congress', William Jameson & Co. v. Morgenthau, 307 U.S. 171, 59 S.Ct. 804, 83 L.Ed. 1189 (1939).

A judgment for the plaintiff would put the operation of 22 U.S.C. § 211a and 8 U.S.C. § 1185 under the restraint of an equity decree. The constitutional claim is plainly substantial, for in Kent v. Dulles, 357 U.S. 116, 130, 78 S.Ct. 1113, 1120, 2 L.Ed.2d 1204 (1957) the Supreme Court said: "we deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect." The Supreme Court's refusal to grant certiorari in three cases[2] involving geographic restrictions, all arising subsequent to Kent v. Dulles, supra, does not render the present claim insubstantial. The Court has frequently reiterated that "[t]he denial of a writ of certiorari imports no expression of opinion upon the merits of the case * * *." United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1922). See also Stern & Gressman, Supreme Court Practice § 5–7 (3d ed. 1962).

The plaintiff claims, *inter alia*, that if §§ 211a and 1185 authorize the Secretary to place geographic limitations upon the right to travel, they are unconstitutional by reason of an unlawful delegation of legislative power to the Executive. He argues that a reading of these sections shows that they are devoid of any stand-

1. See p. 82 infra.

2. Porter v. Herter, 107 U.S.App.D.C. 400, 278 F.2d 280 (D.C.Cir. 1960), cert denied, 361 U.S. 918. 80 S.Ct. 260, 4 L.Ed. 2d 185 (1959); Worthy v. Herter, 106 U.S.App.D.C. 153, 270 F.2d 905 (D.C. Cir. 1959), cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959); Frank v. Herter, 106 U.S.App.D.C. 54, 269 F. 2d 245 (D.C.Cir. 1959), cert. denied, 361 U.S. 918, 80 S.Ct. 256, 4 L.Ed.2d 187 (1959).

ards or principles by which the Secretary is guided.

Inasmuch as this plaintiff seeks affirmatively to enjoin the operation of a passport regulatory system, the propriety of empaneling a three-judge tribunal is manifest. The legislative history of § 2282 indicates that it was enacted to prevent a single federal judge from paralyzing the operation of an entire administrative system by the issuance of a broad injunctive order.

"Repeatedly emphasized during the congressional debates on § 2282 were the heavy pecuniary costs of the unforeseen and debilitating interruptions in the administration of federal law which could be wrought by a single judge's order, and the great burdens entailed in coping with harassing actions brought one after another to challenge the operation of an entire statutory scheme, wherever jurisdiction over government officials could be acquired, until a judge was ultimately found who would grant the desired injunction. 81 Cong.Rec. 479–481, 2142–2143 (1937)." Kennedy v. Mendoza-Martinez, supra, 372 U.S. at 155, 83 S.Ct. at 560, 9 L.Ed.2d 644.

This is truly a substantial constitutional challenge to the sovereignty of this Nation. This plaintiff's effort to enjoin the Secretary of State from enforcing the statutory law and its attendant regulations is not merely the simple and seemingly harmless application of a lone tourist; it is in fact a pilot case precedent, which if sustained, would open up an immediate thoroughfare for unrestricted travel between the United States and Cuba. Such an act of judicial audacity would not only defeat the clear intention of Congress as established by law,[3] but also strike down the declared foreign policy of the Executive Branch of the National Government.[4] A substan-

3. (a) Immigration and Nationality Act of 1952, § 215, 66 Stat. 163, 190, 8 U.S.C. § 1185 (1952).

(b) On October 3, 1962, the Congress passed a joint resolution stating that the United States is determined, *inter alia*: "* * * to prevent by whatever means may be necessary, including the use of arms, the Marxist-Leninist regime in Cuba from extending, by force or the threat of force, its aggressive or subversive activities to any part of this hemisphere * * *." 76 Stat. 697.

4. (a) In March of 1963, President Kennedy participated in a conference with the Presidents of the five Central American Republics and Panama. A result of this conference was the Declaration of Costa Rica a passage of which is quoted below:

"The Presidents agree that Ministers of Government of the seven countries should meet as soon as possible to develop and put into immediate effect common measures to restrict the movement of their nationals to and from Cuba, and the flow of material, propaganda and funds from that country.

"This meeting will take action, among other things, to secure stricter travel and passport controls, including appropriate limitations in passports and other travel documents on travel to Cuba.

Cooperative arrangements among not only the countries meeting here but also among all OAS members will have to be sought to restrict more effectively not only those movements of people for subversive purposes but also to prevent insofar as possible the introduction of money, propaganda, materials, and arms. Arrangements for additional sea and air surveillance and interception within territorial waters will be worked out with cooperation from the United States." 48 Dept. State Bull. 511, 517 (April 8, 1963).

(b) Pursuant to the agreement entered into in Costa Rica, a meeting of the Ministers of Government took place in April of 1963 at Managua, Nicaragua. Resolution I of that meeting is significant to the instant matter:

"The meeting of Ministers of Government, Interior and Security convoked pursuant to the pertinent section of the Declaration of Central America signed by the Presidents of the seven countries in San Jose, Costa Rica on March 19, 1963.

AGREES

"To recommend to their Governments that they adopt, within the limitations of their respective constitutional provisions, measures to be put into effect immediately, to prohibit, restrict and discourage the movement of their na-

tial constitutional question is in issue. The fact that the statutes' validity and their attendant regulations are in this instance being upheld, rather than nullified, does not alter the principle. Bauer v. Acheson, 106 F.Supp. 445, 452 (D.D.C. 1952).

All of the necessary elements are present to require that this matter be heard and determined by a three-judge court. 28 U.S.C. § 2282.

## MERITS

■ The right of a citizen to travel is a part of the "liberty" of which he cannot be deprived, except by due process of law. This precept is recognized and guaranteed under the Fifth Amendment to the Federal Constitution.

" * * * (T)he right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment. If that 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress. * * * And if that *power is delegated, the standards must be adequate to pass scrutiny by* the accepted tests. * * * Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them." Kent v. Dulles, supra, 357 U.S. at 129, 78 S.Ct. at 1120, 2 L.Ed.2d 1204.

The issue in this case is whether or not geographical passport restrictions imposed by the Secretary of State in respect to travel to Cuba are authorized by Congressional act and if so are those statutes which purport to grant such authority repugnant to constitutional limitations. It is this Court's finding that Congress has granted adequate authority to the Executive department to make these regulations, that their application in this instance does not violate due process and the statutes which authorize the regulations, 22 U.S.C.A. § 211a and 8 U.S.C.A. § 1185 are valid and constitutional.

In considering this constitutional issue the Court is acutely mindful of the separation of powers and that certain areas

tionals to and from Cuba. To this end, they propose the adoption of the following measures:

"1) Provide, as a general rule, that every passport or other travel document which may be issued carry a stamp which indicates that said passport is not valid for travel to Cuba.

"2) Declare officially that nationals who are permitted to travel to Cuba should have the permission duly inscribed in their official travel document.

"3) Promulgate regulations restricting the granting of visas to foreigners who have travelled to Cuba within a stipulated period of time.

"4) Notify travel agencies and transport companies of their measures for due compliance; and inform the governments of other countries through the most appropriate means.

"5) Request the Governments of the Hemisphere:

"(a) Not to allow the nationals of signatory countries to travel to Cuba unless they possess a valid passport or other document issued by their country of origin valid for such travel;

"(b) Not to accept visas, tourist cards or other documents issued to their nationals for travel to Cuba which do not form an integral (non-detachable) part of their passports or other travel documents;

"(c) To observe the limitations placed in the passports or other travel documents of the nationals of signatory governments and not allow them to depart for Cuba;

"(d) To inform the signatory countries through appropriate channels of refusal to allow one of their nationals to depart for Cuba; and

"(e) To provide the signatory Governments the names of their nationals which may appear on the passenger list of any airplane or ship going to or coming from Cuba." 48 Dept. State Bull. 719 (May 6, 1963).

(c) "Embargo On All Trade With Cuba," Proc. No. 3447, 76 Stat. 1446, U.S. Code Cong. and Adm.News 1962, p. 4173.

(d) "Interdiction of the Delivery of Offensive Weapons to Cuba," Proc. No. 3504, 27 F.R. 10401, U.S.Code Cong. and Adm.News 1962, p. 4241.

(e) "Cuban Assets Control Regulations," 31 C.F.R. 515.201 (Supp.1963).

of government are relegated solely to Congress, others to the Executive and some are common to both. The Executive may act in certain fields until legislative action becomes operative and the law-making power then controls. Congress' right to lay statutory restrictions on the President when he treads such legislative ground is conceded unanimously by the Supreme Court; an ample safeguard is available if Congress chooses to apply it. Until Congress does so choose, "[w]e (the Court) should hesitate long before limiting or embarrassing such powers." Mackenzie v. Hare, 239 U.S. 299, 311, 36 S.Ct. 106, 108, 60 L.Ed. 297 (1915). The President is the active agent of the Nation, not of the Congress; and he derives that status directly from the Executive powers vested in him by the Constitution. U.S.Const. Art. II, §§ 1, 2, and 3. He must, of course, obey and carry out the laws enacted by Congress, not because he is subservient, but because the Constitution directs him to do so. Thus it becomes obvious that in certain areas of government the authority of the Legislative and Executive departments overlap; and a concurrent authority of both is cognizable.

> "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1951) (concurring opinion).

The field of passport regulation and control cuts across the law-making functions of Congress and the Chief Executive's responsibility in the field of foreign affairs.

> "We think the designation of certain areas of the world as forbidden to American travelers falls within the power to conduct foreign affairs. The bare determination that certain areas outside this hemisphere are trouble spots, or danger zones, is a phase of 'foreign affairs'. Such a determination involves information gleaned through diplomatic sources and channels, and a judgment premised in large part upon foreign policy. The grounds upon which the President would make such a designation are foreign considerations, foreign affairs and policy. Indeed it would seem that such a restriction is in and of itself a foreign policy. It is at least an instrument of foreign policy." Worthy v. Herter, 106 U.S.App.D.C. 153, 270 F.2d 905, 910 (D.C.Cir. 1959), cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959).

Passport control was not designed solely as a protection for internal security. To adopt such thinking would be naive and unrealistic. So many phases of internal security are intertwined with foreign affairs in the administration of passport control that the two become inseparable. This area of government requires a joint-control effort of the Congress and the Executive, if the intended results are to be obtained. It is one where Congress legislates broad laneways of authority to the Executive, within which he must exercise his discretion in effectively administering that authority in a fast changing climate of world affairs.

Congress has provided that the Executive shall take all necessary steps short of an act of war to protect the rights and liberties of American citizens on foreign soil.[5] Certainly it is consistent

---

5. 22 U.S.C.A. § 1732: "Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forth-

with to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release

with an overall policy that he should exercise that authority granted by law, to prevent incidents occurring in those countries, where normal diplomatic relations are non-existent. Those who would pursue this right of unlimited freedom to travel abroad at will, are those who would not hesitate to criticize their government for failing to protect them, if the need arose. This attitude is not dampened, even when such action could jeopardize the foreign policy of the nation. Personal vigilance to safeguard freedom should never be permitted to become a sword used for the destruction of the edifice it protects it is protecting.

In this case the authority of the Secretary of State is founded on two specific acts of the Congress, namely, the Passport Act of 1926, 44 Stat. 887, 22 U.S.C. § 211a and § 215 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 190, 8 U.S.C. § 1185.

22 U.S.C.A. § 211a:

"The Secretary of State may grant and issue passports, * * * under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports."

8 U.S.C.A. § 1185:

"(a) When the United States is at war or during the existence of any national emergency proclaimed by the President, * * * and the President shall find that the inter-

ests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or the Congress, be unlawful * * *.

"Citizens

"(b) After such proclamation as is provided for in subsection (a) of this section has been made and published and while such proclamation is in force, it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport."

On December 16, 1950, the President promulgated Presidential Proclamation 2914,[6] which declared, for reasons therein set forth, the existence of a national emergency. This executive action preceded and was operative when Congress passed 8 U.S.C. § 1185. Thereafter, on January 17, 1953, pursuant to the foregoing legislation, the President reiterated the existence of the national emergency and accordingly issued a new Presidential Proclamation.[7] It is to be noted

---

so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress."

6. Proc. No. 2914, 64 Stat. A454.

7. Proc. No. 3004, 67 Stat. c31:

"WHEREAS section 215 of the Immigration and Nationality Act, enacted on June 27, 1952 (Public Law 414, 82nd Congress; 66 Stat. 163, 190), authorizes the President to impose restrictions and prohibitions in addition to those otherwise provided by that

Act upon the departure of persons from, and their entry into, the United States when the United States is at war or during the existence of any national emergency proclaimed by the President or, as to aliens, whenever there exists a state of war between or among two or more states, and when the President shall find that the interests of the United States so require; and

"WHEREAS the national emergency the existence of which was proclaimed on December 16, 1950, by Proclamation 2914 still exists; and

"WHEREAS because of the exigencies of the international situation and of the national defense then exist-

that not only did it promulgate the continued existence of the national emergency previously referred to in the earlier proclamation, but it pointed to the authority emanating from the Immigration and Nationality Act passed by Congress, which became law on June 27, 1952, as the basis for executive action. This proclamation has never been rescinded or otherwise terminated. The existence of the national emergency still continues.

The House Judiciary Committee of the Congress had compiled for its use in 1958, all those provisions of law which had been brought into effect by the declaration of a national emergency by the President. It was again revised in 1962 and published as the "Report to the Committee on the Judiciary House of Representatives, 'Provisions of Federal Law in Effect in Time of National Emergency'." The foreword of the report prepared by the Committee's Chairman states:

"The emergency proclaimed by the President in 1950 had not yet been terminated and the chronic state of international tensions made it clear that it would not be terminated in the foreseeable future. * * *

"The heightened international tensions which developed in the latter part of 1961 created a new interest in the legal consequences of the actions which might be taken in the cold war by Congress or the President. In particular, there was substantial concern with knowing exactly what legislation would become effective upon the declaration of a

ing Proclamation No. 2523 of November 14, 1941, imposed certain restrictions and prohibitions, in addition to those otherwise provided by law, upon the departure of persons from and their entry into the United States; and

"WHEREAS the exigencies of the international situation and of the national defense still require that certain restrictions and prohibitions, in addition to those otherwise provided by law, be imposed upon the departure of persons from and their entry into the United States:

"NOW, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, acting under and by virtue of the authority vested in me by section 215 of the Immigration and Nationality Act and by section 301 of Title 3 of the United States Code, do hereby find and publicly proclaim that the interests of the United States require that restrictions and prohibitions, in addition to those otherwise provided by law, be imposed upon the departure of persons from, and their entry into, the United States; and I hereby prescribe and make the following rules, regulations, and orders with respect thereto:

"1. The departure and entry of citizens and nationals of the United States from and into the United States, including the Canal Zone, and all territory and waters, continental or insular, subject to the jurisdiction of the United States, shall be subject to the regulations prescribed by the Secretary of State

and published as sections 53.1 to 53.9 inclusive, of Title 22 of the Code of Federal Regulations. Such regulations are hereby incorporated into and made a part of this proclamation; and the Secretary of State is hereby authorized to revoke, modify, or amend such regulations as he may find the interests of the United States to require.

"2. * * *

"3. * * *

"4. * * *

"5. I hereby direct all departments and agencies of the Government to cooperate with the Secretary of State in the execution of his authority under this proclamation and any subsequent proclamation, rule, regulation, or order issued in pursuance hereof; and such departments and agencies shall upon request make available to the Secretary of State for that purpose the services of their respective officials and agents. I enjoin upon all officers of the United States charged with the execution of the laws thereof the utmost diligence in preventing violations of Section 215 of the Immigration and Nationality Act and this proclamation, including the regulations of the Secretary of State incorporated herein and made a part hereof, and in bringing to trial and punishment any persons violating any provision of that section or of this proclamation.

"To the extent permitted by law, this proclamation shall take effect as of December 24, 1952."

national emergency by the President or Congress, or both."

On Page 23, pargaraph 6(c) of this report the statute presently in question, 8 U.S.C. § 1185 appears.

Presidential Proclamation 3004 specifically incorporated by reference the regulations previously prescribed by the Secretary of State and published under Title 22 of the Code of Federal Regulations §§ 53.1 to 53.9; and in addition it authorized the Secretary to revoke, modify or amend these regulations as he might find the interests of the United States to require. The applicable portions provide:

§ 53.1 "The term 'United States' as used in this part includes the Canal Zone, and all territory and waters, continental or insular, subject to the jurisdiction of the United States.

§ 53.2 "No citizen of the United States or person who owes allegiance to the United States shall depart from or enter into or attempt to depart from or enter into any part of the United States as defined in § 53.1, unless he bears a valid passport which has been issued by or under authority of the Secretary of State or unless he comes within one of the exceptions prescribed in § 53.3.

§ 53.3. "No valid passport shall be required of a citizen of the United States or of a person who owes allegiance to the United States:

(a) " * * *

(b) "When traveling between the United States and any country or territory in North, Central, or South America or in any island adjacent thereto: Provided, That this exception shall not be applicable to any such person when traveling to or arriving from a place outside the United States for which a valid passport is required under this part, if such travel is accomplished via any country or territory in North, Central, or South America or any island adjacent thereto: * * *

* * * * * *

§ 53.8 "Nothing in this part shall be construed to prevent the Secretary of State from exercising the discretion resting in him to refuse to issue a passport, to restrict its use to certain countries, to withdraw or cancel a passport already issued, or to withdraw a passport for the purpose of restricting its validity or use in certain countries."

On January 16, 1961 the Secretary of State, pursuant to the authority contained in Presidential Proclamation 3004, amended 22 C.F.R. § 53.3(b) (1958) by Department Regulation 108.456, 26 F.R. 482 so as to provide:

§ 53.3(b) "When traveling between the United States and any country, territory or Island adjacent thereto in North, Central or South America, excluding Cuba: * * *."

Simultaneously, Public Notice 179 was publicized,[8] and the Department of State distributed Press Release No. 24[9] both

---

8. It read:

"In view of the conditions existing in Cuba and in the absence of diplomatic relations between that country and the United States of America I find that the unrestricted travel by United States citizens to or in Cuba would be contrary to the foreign policy of the United States and would be otherwise inimical to the national interest.

"Therefore pursuant to the authority invested in me by Sections 124 and 126 of Executive Order No. 7856, issued on March 31, 1938, (3 F.R. 681, 687, 22 CFR 51.75 and 51.77) under authority of Section 1 of the Act of Congress approved July 3, 1926, (44

Stat. 887, 22 USC 211a), all United States passports are hereby declared to be invalid for travel to or in Cuba except the passports of United States citizens now in Cuba. Upon departure of such citizens from Cuba their passports shall be subject to this order.

"Hereafter United States passports shall not be valid for travel to or in Cuba unless specifically endorsed for such travel under the authority of the Secretary of State or until this order is revoked." 26 Fed.Reg. 492.

9. It read:

"The Department of State announced today that in view of the United States

of which promulgated more fully the purpose of the regulations and the administrative policy of the department in their application.

The issues in this case are clearly distinguishable from Kent v. Dulles, supra. The Court there held that these two statutes, 8 U.S.C. § 1185 and 22 U.S.C. § 211a, did not authorize the Secretary to withhold passports of citizens, because of their beliefs or associations; and that the employment of such a standard could not be used to restrain the citizen's right of free movement.

"We, therefore, hesitate to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." Kent v. Dulles, supra, 357 U.S. at 128, 78 S.Ct. at 1119, 2 L.Ed.2d 1204.

"The government *may* have the power to forbid the travel of all citizens to particular geographic areas because of war or national emergency. It does not have the power to restrain travel of citizens with whose politics it disagrees." Boudin (Plaintiff's counsel), The Constitutional Right to Travel, 56 Colum.L. Rev. 47, 74 (1956).

In the present case, Congress established by law the President's right to regulate and control passport visas within broad bounds of Executive discretion. There has been no claim of arbitrariness in the administration of these regulations. No passport has been claimed to have been denied, because of the applicant's personal beliefs, writings, character, race, religion, or the like. It does in fact bar the travel of all Americans to a specific geographical area. The mere fact that administratively all tourist travel is banned, while bona fide newspapermen and people with previous business interests in Cuba may be considered as eligible for travel is not an arbitrary criteria which would violate due process.

"* * * (J)udicial review even of the formula of selection is narrow and it is limited to determining whether the basis of the choice bears some rational relationship to the ends to be served. The distinction made between news agencies with a demonstrated interest in foreign news coverage and individual reporters must have some relevance to the purpose to be achieved.

\* \* \* \* \* \*

"The foreign policy considerations give the Secretary wide latitude in drawing a line and defining criteria." Frank v. Herter, 106 U.S.App.D.C. 54, 269 F.2d 245, 247–248 (D.C. Cir. 1959) (concurring opinion), cert. denied, 361 U.S. 918, 80 S.Ct. 256, 4 L.Ed.2d 187 (1959).[10]

Government's inability, following the break in diplomatic relations between the United States and Cuba, to extend normal protective services to Americans visiting Cuba, United States citizens desiring to go to Cuba must until further notice obtain passports specifically endorsed by the Department of State for such travel. All outstanding passports, except those of United States citizens remaining in Cuba, are being declared invalid for travel to Cuba unless specifically endorsed for such travel.

"The Department contemplates that exceptions to these regulations will be granted to persons whose travel may be regarded as being in the best interests of the United States, such as news-

men or businessmen with previously established business interests.

"Permanent resident aliens cannot travel to Cuba unless special permission is obtained for this purpose through the United States Immigration and Naturalization Service.

"Federal regulations are being amended to put these requirements into effect.

"These actions have been taken in conformity with the Department's normal practice of limiting travel to those countries with which the United States does not maintain diplomatic relations." Press Release No. 24.

10. It is significant to consider, in addition to the statutes in issue in the present

The petitioner claims that if that power has been granted to the Executive pursuant to the law-making functions of Congress, the standards must be adequate to pass scrutiny by the accepted tests. Panama Refining Co. v. Ryan, 293 U.S. 388, 420–430, 55 S.Ct. 241, 79 L.Ed. 446 (1934).

" 'The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government.' " Locke's Appeal, 72 Pa.St. 491, 498, quoted in, Field v. Clark, 143 U.S. 649, 694, 12 S.Ct. 495, 505, 36 L.Ed. 294 (1891).

"But the authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense." United States v. Grimaud, 220 U.S. 506, 521, 31 S.Ct. 480, 484, 55 L.Ed. 563 (1910).

To claim that Congressional statutes which authorize the Executive to make and administer regulations are not constitutional would destroy the theme of legislative action in multiple fields of accepted governmental regulation. The real test to be applied is whether or not the power delegated in this instance is under the circumstances, so vague, indefinite, and lacking in standards, as to constitute an unwarranted and illegal attempt to delegate to the Executive the Legislative power to make law.

The authority granted defined with general specificity the conditions under which the Executive was authorized to act. Both in time of war and upon the declaration by the President of a national emergency, when the President finds that the interests of the United States requires, may these restrictions on travel departure and entry be imposed. The time or term of their application is limited until the President or Congress shall otherwise order. All of the conditions precedent established by law for the exercise of the power have been fulfilled.[11]

Government is much like a clock mechanism; in order to perform its functions effectively it must operate. To do so in this area of passport administration, which is so inter-related with foreign affairs, considerable discretion and elbow-room must be granted to the Executive.

"Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." United States v. Curtiss-Wright Corp., 299 U.S. 304, 324, 57 S.Ct. 216, 223, 81 L.Ed. 255 (1936).

" 'It is essential to meet the situation that the Executive should have wide discretion and wide authority of action. No one can foresee the different means which may be adopted by hostile nations to secure mili-

case, the basic grant by Congress of power to the Secretary of State. 5 U.S. C.A. § 156: "The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from for-

eign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters respecting foreign affairs as the President of the United States shall assign to the department, and he shall conduct the business of the department in such manner as the President shall direct."

11. See supra note 7.

tary information or spread propaganda and discontent. It is obviously impracticable to appeal to Congress for further legislation in each new emergency. Swift Executive action is the only effective counterstroke.'" Report of the House Committee on Foreign Affairs, H.R.Rep. No. 485, 65th Cong., 2d Sess. 2–3, quoted in Kent v. Dulles, supra 357 U.S. at 133, 78 S.Ct. at 1122, 2 L.Ed.2d 1204 (Clark, J., dissenting).

That part of the plaintiff's prayer for relief which requests that the criminal enforcement provisions of 8 U.S.C. § 1185 (c) be enjoined is not warranted. The law complained of is not in contravention to the Federal Constitution. There are no grounds upon which this Court would be justified in interfering with the criminal enforcement aspects of this statute.

"The duty to enforce the criminal law is vested by the Constitution not in the judicial arm of the government but in the executive. * * * It would be an improvident trespass upon the separation of the powers, if not a complete usurpation of power, were the court to grant immunity in advance of an actual transaction." International Longshoremen's Ass'n. v. Seatrain Lines, Inc., 212 F.Supp. 653, 656 (S.D.N.Y. 1963), rev'd on other grounds, 326 F.2d 916 (2 Cir., 1964).

"The court of equity has at times been called upon to enjoin the enforcement of a criminal prosecution. The rule has been firmly established that it will *not* ordinarily intervene to enjoin the enforcement of the law by the prosecuting officials * * * unless under proper circumstances there would be irreparable injury, and the sole question involved is one of law * * * where a clear legal right to the relief is established." Reed v. Littleton, 275 N.Y. 150, 9 N.E.2d 814, 815–816 (1937).

Therefore, the plaintiff's motion for summary judgment is denied; defendants' motion for summary judgment is granted. So ordered.

BLUMENFELD, District Judge (concurring in part, dissenting in part).

I dissent on the ground that this is a case for a district court of one judge.

### Jurisdiction

The plaintiff brings this action for an injunction to force the Secretary of State to validate his passport for travel to Cuba. The Secretary bases his refusal on existing State Department regulations.

We are confronted with a threshold question of jurisdiction. The question is whether this is a proper case for convening a three-judge court.

The recent per curiam opinion of the Supreme Court in Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962), sets forth the tests which a district court should apply to determine whether a three-judge court is required:

"When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute."

There is no doubt that the constitutional question is not plainly insubstantial, see Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962), for in Kent v. Dulles, 357 U.S. 116, 130, 78 S.Ct. 1113, 1120, 2 L.Ed.2d 1204 (1958), the Supreme Court said: "To repeat, we deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect." And, a basis for equitable relief is alleged.

But, the case does not "otherwise come[s] within the requirements of the three-judge statute," which reads:

Section 2282 of Title 28:

"An interlocutory or permanent injunction restraining the enforce-

ment, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

Here, we are not directly and immediately confronted with the question whether either of the statutes, § 211a or § 1185, by their terms forbid granting to the plaintiff a passport validated for travel to Cuba. The plaintiff himself conceives that his position in this court is to "properly sue to protect his constitutional rights by alleging that the statute relied upon by the administrative agency does not support the action taken by it, and that *if it does* it is unconstitutional." Brief for Plaintiff, p. 5 (emphasis added).

This analysis is fairly derived from his specific prayer for relief:

"(c) Decreeing that the defendant Secretary of State's restrictions upon travel to Cuba, as embodied in his public announcement of January 16, 1961, Press Release No. 24, in Public Notice 179, 26 F.R. 492, and in Departmental Regulation 108.456, 26 F.R. 482–483, are invalid, without any authority in law, and are unsupported by the Passport Act of 1926, 44 Stat. 887, 22 U.S.C. 211a, or by Section 215 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 190, 8 U.S.C. 1185, or by Proclamation 3004, 18 F.R. 489." (Plaintiff's Amended Complaint, p. 7)

The Supreme Court in Kent v. Dulles, 357 U.S. at 129–130, 78 S.Ct. at 1119–1120, 2 L.Ed.2d 1204 treated § 1185(b) *pari passu* with § 211a, although the defendant expressly disclaims reliance upon it here as a source of authority for the regulation excluding travel to Cuba.

The focal point of the plaintiff's attack is clearly upon the regulation itself. "But an attack on lawless exercise of authority in a particular case is not an attack upon the constitutionality of a statute conferring the authority even though a misreading of the statute is invoked as justification. At least, not within the Congressional scheme of § 266. * * * In other words, it [the plaintiff] seeks a restraint not of a statute but of an executive action." [1] Phillips v. United States, 312 U.S. 246, 252, 61 S.Ct. 480, 484, 85 L.Ed. 800 (1941).

There is no logical escape from the proposition that whenever a regulation is held invalid it must mean either that the statute did not authorize the regulation or that the statute in so authorizing it is unconstitutional. In that event, the constitutional question is always reserved for secondary determination. The court's general doctrine of avoiding constitutional questions whenever possible, see United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953), is not without significance in determining whether the special three-judge court procedure should be invoked. The decision in Phillips v. United States that an attack upon a state statute was too remote to be cognizant for the procedural purposes of § 2281 tested by applying the principles set forth by Mr. Justice Cardozo in Gully v. First Nat. Bank, 299 U.S. 109, 116–118, 57 S.Ct. 96, 81 L.Ed. 70 (1936), to differentiate between stages of adjudication at which issues are reached would seem to compel a like determination here. See Kesler v. Department of Public Safety, 369 U.S. 153, 158, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962).

We are not being asked to test the statute against the Constitution; we are being asked to test the departmental regulations. But a regulation is not an "Act of Congress." As William Jameson & Co. v. Morgenthau, 307 U.S. 171, 173, 59 S.Ct. 804, 805, 83 L.Ed. 1189 (1939),

---

1. Section 266 is the predecessor of § 2281 and, although it deals with constitutionality of state statutes, it is fully applicable as in the respect here pertinent it in no way differs from § 2282.

points out, § 2282 does not refer to "an order made by an administrative board or commission" as does § 2281 relating to action by states, but confines its requirement for a three-judge court "to cases of attack upon an 'Act of Congress' upon the ground that 'such Act or any part thereof is repugnant to the Constitution of the United States.'"

The fact that we deal with a constitutional right of a citizen does not mean that the validity of every claimed interference with it must be litigated before a three-judge court. A contrary conclusion is not compelled by a sentence in Mr. Justice Whittaker's opinion in Florida Lime Growers v. Jacobsen, 362 U.S. 73, 76–77, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960), that a three-judge court is required whenever a substantial constitutional question is alleged.[2] The statutes identified by the plaintiff, § 211a and § 1185, present no more of an immediate clash between the Act and the Constitution here than they did in Kent v. Dulles, where the court in openly failing to reach the question of the constitutionality of the same statutes which the plaintiff claims are involved here, said:

"We would be faced with important constitutional questions were we to hold that Congress by § 1185 and § 211a had given the Secretary authority to withhold passports to citizens because of their beliefs or associations. Congress has made no such provision in explicit terms; and absent one, the Secretary may not employ that standard to restrict the citizens' right of free movement." (357 U.S. at 130, 78 S.Ct. at 1120, 2 L.Ed.2d 1204.)

If the Supreme Court did not reach the question whether the same acts of Congress were repugnant to the Constitution

in Kent v. Dulles, our exercise of jurisdiction as a three-judge court would be to permit the plaintiff in this case to wag the dog of a direct route to review by the Supreme Court simply by grasping the tail of a bare allegation of unconstitutionality of a statute and a prayer for an injunction

Examination of Flynn v. Rusk, 219 F. Supp. 709 (D.D.C.1963), appeal pending, in which a three-judge district court was convened, cited by the plaintiff, Brief for Plaintiff, p. 10, discloses a challenge to the constitutionality of the Subversive Activities Control Act of 1950, 64 Stat. 993, 50 U.S.C. § 785 (1958), which on its face and in specific terms forbids any member of a communist organization to make application for or use or attempt to use a passport. In Bauer v. Acheson, 106 F.Supp. 445 (D.D.C.1952), a case essentially the same as ours, upon which the plaintiff also relies, the misgivings of Circuit Judge Fahy over the lack of jurisdiction of a three-judge court led him to dissent, stating:

"In my view therefore the case is one for the usual district court composed of a single judge, with right in the parties to appeal from his decision to the Court of Appeals, followed by right of petition to the Supreme Court for review on writ of certiorari. This litigation should not be deemed within the special class of cases committed by Congress to a specially constituted three-judge court, properly convened only when a substantial question is raised as to the constitutionality of an Act of Congress the enforcement, operation or execution of which is sought to be enjoined, with right of direct appeal to the Supreme Court. 28 U.S.C. § 2282, supra. *Plaintiff in the end*

2. That statement was made in a special context to refute a claim that a proper reading of § 2281 limits the requirement of a three-judge court to cases where the constitutional claim is the *sole* claim before the court. It would be in point here only if the defendant sought to defeat three-judge court jurisdiction on the

ground that the plaintiff had destroyed pristine applicability of § 2282 by alternately raising the question whether the President had a right, apart from an Act of Congress, to impose area restrictions reasonably related to the control of foreign relations inherent in the President's plenary power over foreign affairs.

*seeks at most to enjoin action of the Secretary which might be invalid because not in conformity with the proper construction of the statute under which he acts. She raises, and there is involved, no substantial question as to the constitutionality of the statute.''* (106 F.Supp. at 454) (emphasis added)

That Kent v. Dulles was considered and decided on the merits by the Supreme Court without suggestion that a three-judge court should have been convened cannot be regarded as an omission by it to notice the route by which the case came before it, for as stated in Kesler v. Department of Public Safety, in Mr. Chief Justice Warren's dissenting opinion:

"The question is whether a three-judge court was properly convened for the trial of this case. Although the issue was not considered by the courts below, and has not been raised by the parties here, it is our duty to take independent notice of such matters and to vacate and remand any decree entered by an improperly constituted court." (369 U.S. at 175, 82 S.Ct. at 820, 7 L.Ed.2d 641) [3]

However the situation might be, if regarded solely on the authority of Bauer v. Acheson, we now know that the Supreme Court did not deem an action to enjoin the Secretary of State from refusing to grant a passport on the basis of regulations promulgated under § 211a to require the invocation of a three-judge court. Furthermore, in none of three separately considered appeals from summary judgments for the Secretary of State in cases not distinguishable from this one, rendered by a single judge district court after Kent v. Dulles was decided, did the Court of Appeals for the

District of Columbia Circuit [4] make any suggestion that a three-judge court should have been convened. Worthy v. Herter, 106 U.S.App.D.C. 153, 270 F.2d 905 (D.C.Cir.), cert. denied 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959); Frank v. Herter, 106 U.S.App.D.C. 54, 267 F.2d 245 (D.C.Cir.), cert. denied 361 U.S. 918, 80 S.Ct. 256, 4 L.Ed.2d 187 (1959); Porter v. Herter, 107 U.S.App. D.C. 400, 278 F.2d 280 (D.C.Cir.1960), cert. denied 361 U.S. 918, 80 S.Ct. 260, 4 L.Ed.2d 185 (1959).

In my opinion, a three-judge court was improvidently invoked.

### Merits

I would deny plaintiff's motion for summary judgment and grant the Secretary of State's motion for summary judgment. For reasons which are set forth at the close of this opinion, I would dismiss the action against the Attorney General.

In the event it should hereafter be decided that this case should be determined by the action of a district judge, it is appropriate that I briefly express my views on the merits.

The statute, § 211a, has placed the authority to issue passports in the Secretary of State "under such rules as the President shall designate and prescribe for and on behalf of the United States." One of those rules provides: "The Secretary of State is authorized in his discretion * * * to restrict it [a passport] against use in certain countries * * *." 22 C.F.R. § 51.75 (1949). Under a claim of authority thus derived from § 211a, the Secretary imposed a restriction upon travel to Cuba on January 16, 1961, Public Notice 179. Plaintiff's contention that the purpose of § 211a was merely to centralize a minis-

3. This portion of the dissenting opinion did not divide the justices, see 369 U.S. at 155, 82 S.Ct. at 809–810, 7 L.Ed.2d 641, who rather focused on the question whether an immediate issue of constitutionality was presented. 369 U.S. at 157, 82 S.Ct. at 810–811, 7 L.Ed.2d 641.

4. Six of the eight circuit judges who had

sat en banc on Kent v. Dulles, sub nom. Briehl v. Dulles, 101 U.S.App.D.C. 239, 248 F.2d 561 (D.C.Cir.1957), were equally distributed on three separate panels who upon review affirmed single judge district court determinations that state department regulations imposing area restrictions upon passports were valid.

terial duty to issue passports solely in the Secretary of State ignores the long standing view "that the issuance of passports is 'a discretionary act' on the part of the Secretary of State." Kent v. Dulles, 357 U.S. at 124–125, 78 S.Ct. at 1117–1118, 2 L.Ed.2d 1204. While the Supreme Court held that the Secretary of State does not have "unbridled discretion to grant or withhold", Id. at 129, 78 S.Ct. at 1120, 2 L.Ed.2d 1204, a passport, § 211a was not given such a restricted construction as that for which the plaintiff contends. When the Supreme Court in Kent v. Dulles rejected the Secretary's argument that long continued executive construction prior to the 1926 enactment of § 211a warranted the inference that he had discretion to deny a passport on the ground of personal beliefs and associations of a citizen, it pointed out that the scattered rulings affecting communists were insufficient and that the administrative practices which had "jelled" in two categories relating to allegiance and criminal activity were not relevant. But in rejecting the probative value of some and the relevancy of other prior administrative practices to establish that Congress had adopted an interpretation of discretion that embraced the right to deny a passport on the ground of beliefs of a citizen, the Supreme Court did not decide that the Secretary's discretion to deny passports was limited to only those categories which had jelled. The Court went no further than to "hesitate to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him *unbridled discretion* to grant or withhold a passport from a citizen for *any* substantive reason he may choose." Id. at 128, 78 S.Ct. at 1119, 2 L.Ed.2d 1204 (emphasis added). It was reiterating what it had already said about discretion: "But the key to that problem, as we shall see, is in the manner in which the Secretary's discretion was exercised, not in the bare fact that he had discretion." Id. at 125, 78 S.Ct. at 1118, 2 L.Ed.2d 1204. The point of Kent v. Dulles is that the exercise of discretion by the Secretary is subject to judicial scrutiny. See also Schachtman v. Dulles, 96 U.S.App.D.C. 287, 225 F.2d 938, 940 (D.C.Cir. 1955). Although the criteria for measuring the Secretary's discretion have not been determined other than that it may not be "unbridled", the fact that Congress gave it to the Executive indicates that it is to be exercised in relation to his powers to conduct foreign affairs. See Schachtman v. Dulles, 225 F.2d at 941–942. It is plain to see that Congress was thinking primarily of the recognized power of the President to conduct foreign affairs when through § 211a it placed the exclusive authority to issue passports in *the Secretary of State,* the arm of the President in conducting foreign affairs, under "such rules as *the President* shall designate and prescribe *for and on behalf of the United States,* * * *." (Emphasis added). Travel to other nations is at least one facet of foreign affairs.

Plaintiff's claim that § 211a is an unconstitutional delegation of power has no merit. The role of delegation is governed not only by the conditions surrounding the particular problem in this case, but by general premises underlying the conduct of foreign affairs, the critical phases of which have always been entrusted to the President and his Secretary of State. The scope and pace of foreign affairs in the condition of the world today would make it impossible for Congress to act without delegation. Where, as here, Congress seeks to implement presidential power, standards other than a reasonable connection to the conduct oⸯ foreign affairs are not necessary to constitutionality of the delegating act. Chicago & S. Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); see United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). There is no need to consider whether it would fall within the scope of the President's inherent powers. But see Worthy v. Herter, supra.

Although passports are sometimes the subject matter of treaties with other nations, the treaty power may include the power to exclude aliens but not the power to impose travel restrictions upon our own citizens. Treaty powers cannot be used to regulate matters which are purely of domestic concern. See Power Authority of New York v. F. P. C., 101 U.S.App.D.C. 132, 247 F.2d 538 (D.C. Cir.), remanded with direction to dismiss as moot, 355 U.S. 64, 78 S.Ct. 141, 2 L. Ed.2d 107 (1957).

The question then is whether the Secretary of State through the exercise of the discretion vested in him by the President pursuant to the power delegated by Congress in § 211a may restrict travel to a country with which the United States has broken off diplomatic relations.

The conduct of our relations with other nations is the primary responsibility of the President. United States v. Curtiss-Wright Export Corp., supra. In particular, the President has the exclusive power to determine whether to recognize a foreign government and whether to initiate and maintain diplomatic relations. United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942). This is not a case like Kent v. Dulles, where the passports were denied to certain citizens because of their beliefs and associations. Rather it designates certain parts of the world forbidden to all American travelers. This can hardly be regarded as arbitrary or capricious by this plaintiff. Cf. Perkins v. Elg, 307 U.S. 325, 350, 59 S.Ct. 884, 83 L.Ed. 1320 (1939). It relates not to internal security, but to foreign affairs.

The refusal to validate plaintiff's passport for travel to Cuba relates to an exercise of the power to conduct foreign affairs which the Chief Executive already has and is well within the discretion given to the Secretary by the President. The amply sufficient reasons published by the Secretary for the promulgation of the regulation which curtails the plaintiff's right to travel to Cuba were starkly emphasized when this government confronted the Soviet Union

with a demand to remove the missiles it had previously brought to Cuba only a few weeks before Zemel began this suit.

I am not inhibited in reaching this result by constitutional considerations, for I believe that the restriction on the right to travel that is involved here is a valid one. "[T]he gravest imminent danger to the public safety" is required in order to justify the exclusion of persons from their homes, Korematsu v. United States, 323 U.S. 214, 218, 65 S.Ct. 193, 195, 89 L.Ed. 194 (1944), and perhaps a similar showing must be made in order to justify the confinement of a citizen within the boundaries of this country. Kent v. Dulles, 357 U.S. at 128, 78 S.Ct. at 1119, 2 L.Ed.2d 1204. But the right to travel is properly subject to a reasonable prohibition on travel to a particular foreign country which our government believes to be so unfriendly to this nation as to require the severance of diplomatic relations with it. I do not regard the plaintiff's right to see for himself what was happening in Cuba to be of so exalted a nature that it cannot be subjected to restraint during a period when the State Department predicts that such travel might provoke international incidents which would necessitate negotiations, see 22 U.S.C. § 1732 (1958), with a government whose existence the United States is committed to ignore.

It remains to consider plaintiff's claim that § 1185 does not authorize prosecution for violation of an area restriction contained in a passport. Apart from the fact that the Secretary expressly disclaims reliance upon it, that statute is concerned solely with the imposition of sanctions for passport violations, and does not undertake to create passport disqualification limitations. Briehl v. Dulles, 101 U.S.App.D.C. 239, 248 F.2d 561, 581 (D.C.Cir. 1957) (dissenting opinion of Bazelon, J.), rev'd sub nom. Kent v. Dulles, 359 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). Since the area restriction in question is a reasonable regulation of the plaintiff's right to travel, the plaintiff's only interest in having the statute construed is to

determine whether he may violate a valid restriction without risking the sanctions which § 1185 imposes for entry or departure from the United States contrary to its provisions. This is not a sufficient interest to require a construction of § 1185 before it is raised in a criminal proceeding. Pauling v. Eastland, 109 U.S. App.D.C. 342, 288 F.2d 126 (D.C.Cir.), cert. denied, 364 U.S. 900, 81 S.Ct. 233, 5 L.Ed.2d 194 (1960); See International Longshoremen's Ass'n v. Seatrain Lines, Inc., 212 F.Supp. 653 (S.D.N.Y.1963), rev'd on other grounds, 326 F.2d 916 (2 Cir. 1964).

J. JOSEPH SMITH, Circuit Judge (concurring in part, dissenting in part).

■ I agree with Judge Clarie that a three judge court has jurisdiction, for the case sufficiently calls into question the constitutionality of the statutes relied upon by the Executive to sustain the regulations embodying area restrictions on the issuance of passports. If § 211a of the Passport Act of 1926, 22 U.S.C. § 211a (1958), the sole statute cited in the regulations as a statutory basis, is construed at face value as a delegation of discretionary power to the Executive to impose restrictions on the issuance of passports to American citizens, it poses a problem of invalid delegation, for there are no standards in the statutory language legislative history, or administrative practice. Comment, Passport Refusals for Political Reasons: Constitutional Issues and Judicial Review, 61 Yale L.J. 171, 192 (1952).

However, I am unable to find in either § 211a of the Passport Act of 1926 or in § 215 of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1185 (1958), any basis for the area restrictions in the regulations proclaimed by the State Department. Neither act was designed to meet the present problem. Section 211a is nearly identical with the original passport act, 11 Stat. 60 (1856), which was intended to preserve proper respect for American passports by centralizing their issuance in the Federal Government. A number of foreign governments had re-fused to recognize American passports that were being issued by local magistrates and officials. At that time no passport was necessary to travel abroad, and Congress hardly intended this Statute to authorize the Executive to restrict travel. See Boudin, The Constitutional Right to Travel, 56 Colum.L.Rev. 47, 52–53 (1956); Comment, Passport Refusals for Political Reasons, supra; Note, 41 Corn.L.Q. 282 (1956). See also, Assoc. of the Bar of the City of N. Y., Freedom to Travel 6–7 (1958). Section 215 of the Immigration and Nationality Act of 1952 was designed to control entry and exit over our borders in time of national emergency by preventing arrival or departure without a valid passport.

Since the right to travel is constitutionally protected, some clear grant of power to curtail it must exist before any infringement of the right to travel is upheld. As the Supreme Court put it in Kent v. Dulles, 357 U.S. 116, 129, 78 S. Ct. 1113, 1119–1120, 2 L.Ed.2d 1204 (1957):

"Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary of State unbridled discretion to grant or withhold it. If we were dealing with political questions entrusted to the Chief Executive by the Constitution we would have a different case. But there is more involved here. In part, of course, the issuance of the passport carries some implication of intention to extend the bearer diplomatic protection, though it does no more than 'request all whom it may concern to permit safely and freely to pass, and in case of need to give all lawful aid and protection' to this citizen of the United States. But that function of the passport is subordinate. Its crucial function today is control over exit. * * * [T]he right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment if that 'liberty' is to be regulated, it must

be pursuant to the law-making functions of the Congress. * * * And if that power is [to be] delegated, the standards must be adequate to pass scrutiny by the accepted tests."

Where constitutional rights are restrained, Kent v. Dulles requires that we be reluctant to imply a broad grant of power by implication from statutes not clearly designed for the purpose. Hence the Supreme Court construed § 211a and § 215 narrowly to grant the Executive the power to deny a passport on only two grounds: (1) lack of proof of citizenship and allegiance to the United States and (2) the participation in illegal conduct. "We can say-with assurance that whatever may have been the practice after 1926, at the time the Act of July 3, 1926 [211a], was adopted, the administrative practice, so far as relevant here, had jelled only around the two categories mentioned. We, therefore, hesitate to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." 357 U.S. at 128, 78 S.Ct. at 1119, 2 L.Ed.2d 1204. If the statutes are to be construed narrowly to preserve individual rights and to avoid constitutional doubts, they cannot be read as the majority read them as granting to the Secretary of State the power to restrict travel to certain foreign areas for any substantive reason he may choose.

Even if one adopts the view of the four dissenters in Kent v. Dulles—that the legislative history of the predecessors of § 215 and the administrative practice indicated Congressional intent to permit the Secretary of State to exercise his discretion to deny passports to those whose travel might endanger the internal security of the United States—there is no finding that travel to Cuba by Zemel or those similarly situated would endanger the internal security of the United States. Moreover, the language of § 215 says nothing about empowering the Secretary of State to restrict travel to certain foreign areas. Rather it says that no citizen shall attempt to enter or leave the United States in time of national emergency without a valid passport. It requires a truly remarkable feat of judicial gymnastics to construe this statute narrowly as a grant of power to invalidate passports for travel to certain countries. The regulations themselves did not purport to be based on § 215.

I do not understand the majority to adopt the approach of the District of Columbia Court of Appeals in Worthy v. Herter, 106 U.S.App.D.C. 153, 270 F.2d 905 (1959), cert. denied 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed. 186 (1959), which found the power of the Secretary of State to impose area restrictions inherent in the Executive's plenary power over foreign affairs. Kent v. Dulles implicitly rejected the notion that the Executive had inherent constitutional power to curtail individual freedom to travel abroad. If such inherent power existed, what would be its bounds? Could travel to France be curtailed if the Executive decided that foreign policy required such curtailment to impose sanctions because of DeGaulle's recent recognition of Red China? If so, it is easy to see how "such executive power could, by increasing the number of nations to which travel is excluded while expanding the excepted class of persons for whom travel to such nations is permitted, approach the absolute discretionary control over travel held without warrant in the Constitution by the Kent decision." Note, 73 Harv.L.Rev. 1610, 1611 (1960).

But the majority seem to suggest that passport control is so intertwined with foreign affairs that Congress must have legislated the Executive "broad laneways of authority." Rather dubious support for this proposition is sought from 22 U.S.C. § 1732 (1958), which requires the President to take steps short of war to secure the release of Americans imprisoned abroad. Still, the entire approach flies in the teeth of the language of Kent v. Dulles—"Where activities or enjoyment, natural and often necessary to the well-

being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them" 357 U.S. at 129, 78 S.Ct. at 1120, 2 L.Ed.2d 1204.

We do not pass here on the desirability of area restrictions on travel. I should think Congress might well be justified in this period of international tensions produced by the Cold War in authorizing curtailment of travel to an actively unfriendly nation such as Cuba. It is entirely unrealistic to pretend that there was an end to emergency because of the Korean armistice. However, it is up to Congress to determine that conditions require a dilution of the freedom to travel through area restrictions on passport. See Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), where the Supreme Court upheld the use of the war power to restrict the freedom of movement of citizens of Japanese origin after a Congressional determination of "the gravest imminent danger to the public safety." Cf. Flynn v. Rusk, 219 F.Supp. 709 (D.C.D.C.1963); Mayer v. Rusk, 224 F.Supp. 929 (D.C.D.C.1963) (on appeal to the Supreme Court, Dkt. 746). The problem here is that as yet Congress has made no determination that there is an overriding need for area restrictions. After the Supreme Court's decision in Kent v. Dulles, President Eisenhower made a special request to Congress for legislation authorizing the Secretary of State, subject to substantive and procedural safeguards, to deny passports to persons whose travel would be inimical to the security or foreign relations of the United States and to impose restrictions on the use of passports by Americans for travel to areas where their presence might conflict with foreign policy objectives. Special Message of July 7, 1958, 104 Cong.Rec. 11849, 3 U.S.Code Cong. & Admin.News, p. 5465, 85th Cong., 2nd

Sess. (1958). While legislation making it unlawful for members of Communist organizations to be issued passports has been passed, none of the several bills introduced in recent years to authorize area restrictions on passports has been enacted. E. g., H.R. 13318, 85th Cong., 2nd Sess.

I would hold that such legislation is necessary, for the regulations cannot be supported by the existing statutes, inherent executive power, or by any executive agreement. Even if we assumed that constitutional rights could be overridden by an executive agreement, the Managua Resolution of April 3, 1964 was not an executive agreement. The ministers of the seven nations present agreed only to recommend to their governments the adoption, "within the limitations of their respective constitutional provisions", the restriction and discouragement of the movement of their national to Cuba. Area restrictions may be necessary and desirable, but Congress should take the responsibility for authorizing them after a full fact-finding inquiry.

Therefore, I would hold that the present statutes do not authorize area restrictions on travel and that the Executive cannot restrict the right to travel without specific statutory authority. I respectfully dissent from the denial of a declaratory judgment to that effect. I dissent not because I disapprove of the ends sought by the area restrictions imposed thus far, but because these restrictions are based on a claimed power whose limits are vague and undefined and whose source I cannot specify.

While I disagree, as indicated, with the view that the area restrictions are authorized, and would grant a declaratory judgment that they are not, I would dismiss the action as against the Attorney General as at best premature.